**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- X

KATIE ELLEN PURIS,                                              :

                                     :        Civil Case No.:

                   Plaintiff,     :

                                       :

           v.                   :        **COMPLAINT**

                                       :

TIKTOK INC. and BYTEDANCE LTD.,     :

                                       :        **Jury Trial Demanded**

                   Defendants.   :

--------------------------------------------------------- X

Plaintiff Katie Ellen Puris ("Puris") hereby alleges, by and through her undersigned counsel, Wigdor LLP, as and for her Complaint against Defendants TikTok Inc. ("TikTok") and ByteDance Ltd. ("ByteDance") (together, the "Company" or "Defendants") as follows:

## PRELIMINARY STATEMENT

1.      After decades of success as an advertising and marketing executive, Ms. Puris joined the New York office of TikTok as Managing Director and U.S. Head of Business Marketing in December 2019.

2.      From the beginning of her employment, Ms. Puris was extraordinarily successful, with her performance review showing that she was exceeding TikTok's highest expectations.

3.      Not surprisingly, Ms. Puris continued her upward mobility at the Company, earning a promotion to lead the Global Business Marketing team, a new organization within TikTok, within two months of her hire date.

4.      However, after Ms. Puris—one of the most senior female executives in the United States—was invited to attend and participate in bi-weekly meetings with Lidong Zhang, the Chairman of ByteDance, she was subjected to disparate treatment and ultimately unlawfully

terminated because Lidong Zhang and other corporate executives determined that Ms. Puris lacked the docility and meekness specifically required of female employees. In sum and substance, Lidong Zhang had a stereotypical view of the way women should behave and Ms. Puris, an accomplished executive who celebrated and advocated for her team's successes, did not fit that stereotypical gender mold.

5.      The disparate treatment Ms. Puris experienced only increased as she neared 50 years old and Company executives made it clear that they preferred young, less experienced employees who they believed to be more innovative and pliable. "Hungry" with a desperate display of a need for approval was how the Company defined its ideal employee; generally associated with the young and inexperienced.

6.      Further, the Company was so unconcerned with the safety of its female employees that when Ms. Puris reported she was sexually harassed at an off-site TikTok event, the Company failed to respond appropriately, causing Ms. Puris to choose between her own safety and work opportunities.

7.      At every step, Ms. Puris reported the discriminatory treatment and sexual harassment she faced—to her managers, Human Resources and Employee Relations—and the Company, taking its directives from the office in China, failed to take any corrective action.

8.      When the Company's discriminatory treatment began to affect Ms. Puris emotionally and physically in a life-altering manner, the Company did not even afford her the time to care for herself. Instead, it looked disfavorably at Ms. Puris' attempt to address her worsening health concerns.

9.      Instead, after Ms. Puris made protected complaints, her team was substantially reduced, she received a devastatingly low-performance review, she was denied her annual bonus, she was moved out of her position and she was ultimately unlawfully terminated.

## NATURE OF CLAIMS

10.     Plaintiff seeks declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the Family and Medical Leave Act, 29, U.S.C. § 2601 *et seq*. ("FMLA"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq*. ("ADEA"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("State Human Rights Law"); and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("City Human Rights Law").

## ADMINISTRATIVE PROCEDURES

11.     On May 23, 2023, Ms. Puris filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), an administrative pre-requisite to filing an action under Title VII of the Civil Rights Act of 1964 ("Title VII").

12.     On December 27, 2023, the EEOC issued Plaintiff a Notice of Right to Sue.  This Complaint is being filed within 90 days of the issuance of Plaintiff's Notice of Right to Sue.

13.     Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of this action.

14.     All other prerequisites to the filing of this lawsuit have been met.

## JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under Title VII and ADEA.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and City laws pursuant to 28 U.S.C. § 1367(a).

16.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

17.     Plaintiff Katie Puris was the Global Head of Brand & Creative at TikTok.  She is a resident of the City of New York.  At all times, Ms. Puris was an "employee" under all relevant statutes and worked in New York City.

18.     Defendant TikTok Inc. is owned by ByteDance Ltd.  It is incorporated in California, with its principal address in Culver City, California.  At all relevant times, TikTok Inc. met the definition of "employer" under all relevant statutes.

19.     Defendant ByteDance Ltd. is a Delaware corporation with a principal place of business in Mountain View, California that conducts businesses through local subsidiaries, including TikTok Inc.  It is a privately owned company.  At all relevant times, ByteDance Ltd. met the definition of "employer" under all relevant statues, as it is the parent company of TikTok Inc.

20.     Despite its attempts to appear independent, TikTok's day-to-day management and business decisions came directly from ByteDance's top-level management in China.

**FACTUAL ALLEGATIONS**

I.     **MS. PURIS' IMPRESSIVE PROFESSIONAL BACKGROUND**

21.     Ms. Puris began her professional career in advertising and marketing in 1995 when she worked at several top advertising agencies as an account manager/executive, including Gray Global Group[1] and WB Doner & Company.[2]

22.     In 1998, Ms. Puris joined BBDO, a global advertising agency,[3] as an account executive.  Within a year, she received the first of several promotions, eventually becoming the Senior Vice President and Senior Director.

23.     In 2008, Ms. Puris began working for Google as the Head of Agency where she helped create marketing campaigns using Google platforms.  In this role, Ms. Puris facilitated multi-million-dollar partnership agreements with U.S.-based companies to bring more advertising revenue to Google and its subsidiaries.

24.     In 2011, Ms. Puris began working for Facebook in Global Agency Business Development.  Ms. Puris was promoted several times at Facebook, ultimately becoming the Global Director, Facebook Creative Shop, reporting to Facebook's Chief Creative Officer.  In her role, Ms. Puris led a global creative team that trained and provided professional development for the entire creative organization, executed annual planning of creative initiatives, led global team reporting and analysis of thousands of creative campaigns and organized meetings of creatives across the United States, Middle East, Asia and Latin America.

---

[1]     Grey Global Group is an award-winning global advertising and marketing agency that has been named Global Agency of the Year by AdWeek.  See https://www.grey.com.
[2]     WB Doner & Company is an award-winning U.S.-based marketing and advertising agency that has been named a Standout Agency by AdAge.  See https://www.doner.com.
[3]     BBDO is the second largest global agency network in the world and continually receives accolades and awards for its work.  See, e.g., https://www.bbdo.com/cdn/bbdo_fact_sheet.pdf.

II.   **MS. PURIS JOINS TIKTOK**

25.    In December 2019, Ms. Puris joined TikTok as Managing Director and U.S. Head of Business Marketing to launch the North American Business Marketing organization.  In that role, she reported to Blake Chandlee ("Chandlee"), President, Global Business Solutions, a TikTok executive based in Austin, Texas and Corinna Chen ("Chen"), a TikTok executive based in Beijing, China.  Chandlee and Chen reported to Lidong Zhang, who is based in China and is the Chairman of ByteDance.

26.    Ms. Puris worked from the TikTok's New York office and collaborated with TikTok employees in Los Angeles and internationally.

27.    Ms. Puris was directly and indirectly supervised by ByteDance's Beijing-based executives.

28.    As Managing Director and U.S. Head of Business Marketing, Ms. Puris developed and built the North American Business Marketing organization.

29.    Ms. Puris quickly laid out the mission, vision, goals and deliverables to redefine the organization to include new teams, roles and opportunities.

30.    Ms. Puris hired the first 40 members of the team, including creatives, strategists, event marketers, agency learning leaders, business-to-business ("B2B") specialists, website managers, communications leads and brand safety experts.

31.    Less than two months into the U.S. Head of Business Marketing role, Chandlee and Chen asked Ms. Puris to lead the Global Business Marketing team, a new organization within TikTok.

32.    Ms. Puris accepted the role and led teams in Beijing, New York and Los Angeles.

33.     During the time period, Ms. Puris grew the marketing team to more than 100 employees on opposite coasts and another continent.

34.     Ms. Puris was immediately successful in her role.  For example, she launched TikTok for Business, a platform which assisted businesses looking to launch creative campaigns, which The Drum[4] named the B2B Brand of the Year in 2021.

35.     Ms. Puris also led the campaign "Don't Make Ads, Make TikToks," which transformed the way marketers developed campaigns for the platform to this day.

36.     Ms. Puris, who is regarded as a subject matter expert in digital marketing, was frequently asked to speak at conferences and in interviews, in addition to publishing thought leadership pieces in industry trade publications.

### A.     Ms. Puris' Outstanding Performance Reviews

37.     TikTok's performance rating system includes the following ratings from lowest to highest: F (not meeting expectations); I (improvement needed); M-, M and M+ (meets expectations); and E-, E and E+ (exceeds expectations).

38.     M- and below are considered "low" ratings, M and M+ are considered "mid" ratings, and E- and above are considered "high" ratings.

39.     In Ms. Puris' 2020 mid-year performance rating, she received ratings of E, E, M+ and E, which reflects her immediate success in her role.  The performance feedback noted that Ms. Puris' "accomplishments were very valuable for the company" and that she worked "tirelessly cross-functionally to support different teams."

---

[4]     The Drum is a media company that covers creative agencies.  The Drum Awards is a global awards program which recognizes best practice, the best companies, and the best people from across the marketing and communications industry.  See https://www.thedrum.com/about-us.

40.     In March 2021, Ms. Puris received an on-track performance review and glowing 360 reviews from her direct reports, colleagues and managers alike.  For example:

a.      Sherri Chambers, the Global Head of Brand Strategy, wrote that Ms. Puris had "done a great job serving as the ambassador of [Tiktok for Business] and is highly articulate in delivering the story of the brand to a wide audience."

b.      Jeff Boron, the Global Head of Marketing Communications, wrote that Ms. Puris "leads in an inspiring and very empathetic way" and encouraged her team to "think big, to push what's possible and to ship a lot of work[.]"

c.      Kinney Edwards, the Global Head of the Creative Lab, wrote that Ms. Puris was a "visionary leader and a collaborative partner" and that her "creative energy and willingness to share in the ideas and work of others is rare and infectious."

d.      Ng Chew Wee, the Head of Business Marketing for the Asia Pacific market, wrote that Ms. Puris was "one of the most inclusive and generous leaders" and was "deliberate in ensuring all voices and markets are heard."

**B.      Ms. Puris is Subjected to Age and Sex-Based Discrimination**

41.     In late 2020 and early 2021, ByteDance executives, including Lidong Zhang and others based in Beijing, began reasserting more control over TikTok's day-to-day operations.

42.     The Company required bi-monthly reporting detailing achievements and plans for the following two months.  Ms. Puris' team updates were incorporated into Chandlee's report.  Ms. Puris, like other team leaders, met with ByteDance's leadership bi-monthly to report on her team's progress and planning.

43.     As a result, during 2020, Ms. Puris was invited to attend and participate in Lidong Zhang's bi-weekly meetings; she was provided with a five-to-ten-minute timeslot to share updates from her Business Marketing team.

44.     This was Ms. Puris' first direct engagement with Lidong Zhang.

45.     It became clear immediately that Lidong Zhang was displeased with the way Ms. Puris led her presentations because she celebrated her team's successes and achievements, which

he felt was inappropriate because he believes that women should always remain humble and express modesty.  Essentially, Lidong Zhang believes women should be quiet.

46.     Each presentation included a detailed document as well, which Ms. Puris was not permitted to control herself.  During one presentation, Ms. Puris requested permission to control her document, which upon information and belief, Lidong Zhang found offensive because he believed women did not have the right to even ask for such things.  Again, Lidong Zhang's stereotypical view of women, even in leadership roles, was that they should remain quiet and humble at all times.

47.     Feedback was regularly given at the Company and was a meaningful tool for Ms. Puris and others to address any concerns.  Ms. Puris, sensing that the presentation was not received well, asked for feedback—which was refused.

48.     Instead, Ms. Puris was never permitted to present or speak in the meeting again.

49.     Ms. Puris never heard Lidong Zhang criticize male leaders for not being humble enough.  Yet, he criticized Ms. Puris to executives, causing the erasure of all the deliverables and attributes she brought to the Company.

50.     In addition, although many male employees on the leadership team were invited to one-on-one meetings with Lidong Zhang, he refused to engage in any one-on-one meetings with Ms. Puris.  Importantly, given the Company's culture, it would not have been appropriate or acceptable for Ms. Puris to request an audience with Lidong Zhang, so the only opportunity for those meetings came at Lidong Zhang's request.

51.     In the beginning of 2021, leadership, and specifically Chen, suddenly began micromanaging Ms. Puris' team, which undermined Ms. Puris' contributions and directives.

52.     Upon information and belief, Chen's change in management style was the result of Lidong Zhang's sex-based discriminatory animus toward Ms. Puris, as Chen was acting on behalf of Lidong Zhang's orders once he determined that Ms. Puris did not possess the stereotypical characteristics that he expected women to exhibit.

53.     As a result of micromanagement, Ms. Puris' team endured months of exhausting tactical tasks that required Ms. Puris and her team to work around the clock for months on end.

54.     For example, ByteDance leadership questioned and re-analyzed each component of previously approved marketing plans and encouraged marketing partners to recommend Ms. Puris' and her team's projects for cancellation.

55.     Ms. Puris raised concerns about how she and her team were being treated.

56.     Chen was then suddenly removed from her role. This was not shared internally for weeks and resulted in confusion and chaos.  The Company's failure to even notify Ms. Puris about such a significant change that directly impacted her further illustrates the dismissive treatment Ms. Puris received.

57.     Lidong Zhang's animosity toward Ms. Puris continued to increase.

58.     In January 2021, Ms. Puris' new Human Resources Business Partner, Carl Rivers ("Rivers") shared that he received feedback about Ms. Puris from her team members.  In actuality, Rivers was actively soliciting negative feedback on Ms. Puris.

59.     Indeed, the following week, several team members told Ms. Puris that Rivers pressured them to make negative comments about her.

60.     Upon information and belief, Rivers was acting at the direction of Lidong Zhang.

61.     Chandlee later told Ms. Puris that Rivers reached out to approximately 50 team members to solicit feedback, which is an abnormal number of people to speak with and would include numerous individuals with whom Ms. Puris rarely worked.

62.     This was particularly disturbing since all of Ms. Puris' prior reviews had been stellar.

63.     Carly Zipp ("Zipp"), former Head of B2B Marketing, informed Ms. Puris that Rivers repeatedly pressured her to say negative things about Ms. Puris and that it made her very uncomfortable.  Zipp reported Rivers' conduct to Chandlee, but no corrective action was taken.

64.     Among TikTok employees and as reported in The Financial Times,[5] it is known that TikTok's China-based leadership created "kill lists" of employees that they wanted to force out.

65.     By the second quarter of 2021, it became very evident that Ms. Puris was on  Lidong Zhang's "kill list."

66.     Part of Lidong Zhang's "kill list" approach was to build a case against any employee he placed on the list and instruct other employees to do the same.

67.     Indeed, Chandlee told Ms. Puris that he had to beg Lidong Zhang to give Ms. Puris an "M" performance rating for her full 2020 performance review, which was provided to her in March/April 2021.

68.     Chandlee also shared that he was trying to separate Ms. Puris from Lidong Zhang's oversight to protect her from discriminatory animus.

69.     During her employment, Ms. Puris participated in large ByteDance leadership meetings led by Yiming Zhang, the founder of ByteDance.

---

[5]     See https://www.ft.com/content/f9f5f344-84df-404a-96bd-0047a94bdf34.

70.     During a meeting in the second half of 2021, Yiming Zhang spoke at length about how he would rather hire someone inexperienced and young than someone experienced.  He stated that older people are less willing to change, less innovative and slower.  He expressed a desire for a younger approach and a preference for hiring young people.  He stated that it is better to hire people who do not have experience in a role but can instead grow into it.  At the time, Ms. Puris was 49 years old.

71.     In mid-2021, TikTok made changes to its leadership in an apparent effort to distance itself from China-based ByteDance after criticism and concerns were repeatedly raised about China's influence on TikTok.

72.     As a result in May 2021, Shou Zi Chew, based in Singapore, was appointed TikTok's Chief Executive Officer.  He previously served as ByteDance's Chief Financial Officer. Upon information and belief, Shou Zi Chew was 38 at the time.

73.     While Shou Zi Chew was hired to lead TikTok, media reports detail that Mr. Chew's decision-making power over TikTok is more limited than his title suggests and that, instead, most strategic decisions are ultimately still led by ByteDance.[6]  Indeed, as The New York Times reported, Salvatore Babones, the director of China and free societies at the Center for Independent Studies, said, "If [Shou Zi Chew] didn't want to do something ByteDance wants him to do, he could be fired and someone else could be put in his place."[7]

74.     Indeed, despite his CEO title, Shou Zi Chew was not permitted to take over Global Business Solutions led by Chandlee – the organization to which Ms. Puris' team belonged.  Global Business Solutions controlled all of the advertising dollars generated by TikTok, and ultimately

---

[6]     See https://www.nytimes.com/2022/09/16/technology/tiktok-ceo-shou-zi-chew.html.
[7]     Id.

what, where and when ads ran.  As a result, Chandlee, who was responsible for the way advertising dollars were spent at the Company, continued to report directly to Lidong Zhang in China furthering Lidong Zhang's control.

75.     On or about the same time, Vanessa Pappas ("Pappas") was appointed TikTok's Chief Operations Officer based out of Los Angeles.  Upon information and belief, Pappas is in her mid-40s.

76.     The new leadership became known for promoting a "996" culture at TikTok, which is a term referring to the requirement that employees work from 9 a.m. to 9 p.m. for six days a week, or 72 hours per week.

77.     While a 996 culture had long been prevalent at ByteDance in China, the U.S. offices had previously avoided some of these practices.

78.     The 996 culture disproportionately favored younger employees, who were less likely to have childcare and other family obligations outside of work.  For example, Ms. Puris' Beijing-based reports were initially required to be in the office every other Sunday based on ByteDance policy.  In response, several team members in Beijing rented apartments near the office and began only seeing their families every other weekend.

79.     Ms. Puris' health began to suffer under the stress and pressure placed on her after she became part of Lidong Zhang's "kill list."  She ultimately required numerous surgical procedures because of ulcers, migraines, IBS and other health concerns.

80.     Ms. Puris shared how physically unwell she had become because of the pressure and stress with Chandlee, Chen and Human Resources.

81.     At around the same time, in May 2021, Chandlee and Kate Barney ("Barney"), Head of Human Resources at TikTok for the Americas, began expressing that they wanted to move Ms. Puris out of her role into a different part of the organization.

82.     Upon information and belief, the proposed move was due to Lidong Zhang's discriminatory desire to terminate Ms. Puris.

83.     In discussing moving Ms. Puris out of her current role, Chandlee essentially acknowledged that Ms. Puris required protection from Lidong Zhang's discriminatory treatment. Indeed, Chandlee told Ms. Puris that there was an "enormous spotlight" on her from Beijing that he did not think would go away, that there would continue to be "undue pressure" on Ms. Puris as an individual and a leader, that he could not tell Lidong Zhang that he was a big believer in her and that it had been hard to watch the oversight and control that Beijing (meaning, effectively, Lidong Zhang) had been asserting over Ms. Puris.

84.     Any hope Ms. Puris had for being able to take time off to deal with her physical and emotional stress-related ailments was only further diminished after her frank conversation with Chandlee.

85.     In or around June 2021, Ms. Puris began reporting to Nick Tran ("Tran"), TikTok's Global Head of Marketing, who had joined the Company in or around April 2020.  Mr. Tran was 38 years old at that time.

86.     In her new role, Ms. Puris was the Head of the Global Brand and Creative Organization at TikTok, the internal marketing services enterprise.  The team she supervised was the result of a reorganization and lacked structure, vision and a mission.

87.     Within two weeks, Ms. Puris presented a comprehensive narrative of the team during a leadership call with Tran.

88.     Ms. Puris continued to lead the team, crafting all global and regional brand campaigns, including sports and entertainment partnerships, global cultural moments, consumer marketing innovations and TikTok-owned and sponsored events.

89.     The campaigns Ms. Puris worked on were consistently acknowledged for excellence throughout the industry.  For example, the 2021 "You Have to See It" campaign was named by AdWeek[8] as one of "13 Campaigns That Made Ad Pros Jealous in 2021" in addition to winning numerous industry awards.

90.     Ms. Puris received strong performance feedback from Tran with Tran sharing that Ms. Puris was trending to an overall M+ review in the next cycle.

91.     When Ms. Puris asked Tran why she had not received feedback from Chandlee as part of her review, he told her that Chandlee would not provide positive written feedback because the information would get back to Lidong Zhang.

92.     Notably, Ms. Puris received this positive performance feedback from Tran at a time when her team was dealing with 20 percent attrition and working under immense pressure and impossible deadlines.

93.     In January 2022, TikTok suddenly fired Tran, claiming in the media that he had gone "rogue."[9]  It is not surprising, then, that it was Tran who was unwilling to yield to the pressure from China to provide negative performance feedback to Ms. Puris.

94.     Shortly after Tran's departure, Shou Zi Chew held one-on-ones with Tran's previous direct reports, including Ms. Puris.

---

[8]     AdWeek is a trade publication that bills itself as the "leading source of news and insight serving the brand marketing ecosystem."  See https://www.adweek.com/about/.
[9]     See https://nypost.com/2022/01/19/tiktoks-marketing-chief-ousted-after-going-rogue-with-bizarre-campaigns/; https://www.techspot.com/news/93071-tiktok-parts-ways-marketing-chief-behind-kitchens-resumes.html;

95.     During her interview with Shou Zi Chew, he was disheveled and shared that he had just woken up.  When Ms. Puris shared that she gets ready for work every morning even though she worked from home, Shou Zi Chew asked her what her nationality was.

96.     Ms. Puris thought the question was odd, given that Shou Zi Chew was aware that she was a U.S.-based employee with an American accent.

97.     Despite being uncomfortable with Shou Zi Chew's question, she replied that her family was Italian.  Shou Zi Chew responded, in sum and substance, that this "made sense".  Evidently, Shou Zi Chew believed that Ms. Puris' decision to spend time getting dressed each day was based on her nationality, which only further displays the Company's discriminatory belief system that employees can be categorized by factors like gender and nationality.

98.     As a result of Tran's firing, Pappas became Ms. Puris' direct supervisor and the new interim Global Head of Marketing while also continuing to hold the COO title.

99.     Not surprisingly, after Tran's departure, the Chinese leadership was closely watching both Pappas and Shou Zi Chew.

100.    To be proactive, Ms. Puris immediately reached out to Pappas to facilitate a working relationship.

101.    Shou Zi Chew ultimately instructed Pappas and those she supervised to redo everything planned under Tran's guidance, but the directives were confusing and unclear.

102.    At the same time, under pressure from Chinese leadership, Shou Zi Chew implemented a five-year plan to make TikTok "the most trusted entertainment brand in the world."  Given the concerns about the Chinese government's influence on TikTok and the United States, it was an unrealistic goal set solely to satisfy ByteDance and the Chinese leadership.

103.    In February 2022, Ms. Puris met with Pappas who informed her that she was making changes to TikTok's overall marketing strategy.  This global change would then be translated into regional marketing plans that Ms. Puris could execute with brand and creative campaigns.

104.    Yet, Pappas was unable to make any decisions without Shou Zi Chew's input, which often caused extreme delays and unused media inventory.

105.    Thus, while Chandlee did everything he could to move Ms. Puris to a team without such extreme oversight from Lidong Zhang and other Chinese executives, Tran's termination caused the Chinese leadership to take even greater control over all marketing efforts.

### C.    Ms. Puris Continues Making Protected Complaints and is Retaliated Against

106.    During February and March 2022, Ms. Puris continued to express concerns to Wendy Jimenez ("Jimenez"), the Head of Global Human Resources, about the extreme workload and the negative impact it was having on her team's mental health and well-being.  In particular, she wrote to Jimenez that "[i]n terms of departures, most individuals have cited extreme working conditions.  At least five members on the team have taken or are currently on medical leave this year due to the severe stress and pressure of the work, which have resulted in mental and physical health conditions.  I consistently flagged this to HR and management but no actions were taken to provide my team with more support.  My health has been significantly impacted as well, which I repeatedly shared with HR and leadership while I was the leader of GBM. My doctor encouraged me to take a medical leave, which I looked into with the HR team but ultimately did not feel supported."  In addition to the extreme pressure to perform and concern that taking leave would put her job in jeopardy, Ms. Puris did not feel supported in taking a leave because she was informed that doing so would impact her compensation.

107.    Also in February and March 2022, Ms. Puris worked with her team to develop updated marketing strategies.  She made more than ten attempts to schedule a meeting with Pappas to get feedback and clarify the focus of her organization.  Ms. Puris prepared a slideshow presentation about the new plans but was ultimately unable to meet with Pappas until March 14, 2022.

108.    On March 14, 2022, Pappas told Ms. Puris that the slideshow presentation about her team's new plans was not up to her standards, even though Ms. Puris has never previously had the opportunity to make the presentation to Pappas.

109.    Pappas then stated that based on Tran's feedback and peer reviews, Ms. Puris' 2021 full-year performance review would not be positive and that she would be receiving an "I."

110.    An "I" rating is extremely rare.  In Ms. Puris' entire time at the Company managing large teams through twice-yearly performance cycles, only one employee ever received an "I" rating—and that was because the employee rarely showed up for work for six months.

111.    Understandably, Ms. Puris was shocked given that she had only received positive feedback from her peers and Tran told her she was on track to receive an M+ rating.  In addition, the performance cycle had just begun and was still in progress, and Ms. Puris knew that her colleagues were still in the process of providing feedback on her performance.

112.    It was also unusually rare for a manager to determine a rating of any employee prior to the performance cycle closing because the reviews go through many levels of calibration and are often changed during the process.

113.    Ms. Puris reported the conversation to Jimenez to express her shock and that she did not receive any feedback that would support such a low rating.  She further wrote to Jimenez that she had only had two one-to-one meetings with Pappas, had only ever received high marks

from her direct team and had never received any feedback from Human Resources regarding a concern or complaint.

114.    On March 15, 2022, Ms. Puris reported to Jimenez that she was experiencing "extreme anxiety and stress" as a result of her conversation with Pappas.  She shared that she was really struggling and was being set up to fail.

115.    On April 1, 2022, Ms. Puris again met with Pappas—this time to present a final marketing plan with an analysis and accounting of the work delivered in 2021; the priorities and deliverables based on regions for 2022; and an estimate of the number of hours and personnel needed to complete the work compared to existing resources and headcount.  The rigorous headcount analysis showed that Ms. Puris' team needed an additional 53 employees to fulfill the extensive work required in 2022, although in an effort to get approval, Ms. Puris only requested an additional 30 employees for her headcount.

116.    During another meeting in the spring of 2022, Pappas referenced Ms. Puris' "level" at TikTok in a negative manner, which is a numerical value issued to employees based on experience.  Pappas implied that the Company did not want as many high-level employees.  Given the previous comment by TikTok's founders about their preferences for hiring younger (i.e., lower level) employees and Chandlee informing Ms. Puris that Lidong Zhang said he did not want to hire any senior talent, Ms. Puris understood this to reference her age.

117.    TikTok lacked female leadership, especially on Pappas' team.  A diversity and inclusion analysis shared in late 2021 showed that only 19 percent of Pappas' direct reports were women.

118.    In April 2022, Ms. Puris received a written negative review from Pappas, which included two "I's" and two "M's."

119.    When Ms. Puris received an "I" rating, she knew that her time at the Company was over.  It was considered impossible to recover from such a low rating, particularly when the Company refuses to provide any feedback or steps to improve any alleged deficiencies.

120.    Upon information and belief, Pappas was operating under a directive from ByteDance's leadership in China to push Ms. Puris out based on her age and sex.

121.    Ms. Puris reached out to Jimenez for clarity and wrote: "As I shared with Vanessa, I respectfully challenge an I rating and would like to discuss further as I do not think it is appropriate based on the details shared above, what I inputted into my self review, B&C team and partner feedback."

122.    During a conversation with Jimenez about her performance review, Ms. Puris asked if TikTok was putting together a performance plan to outline the areas that Ms. Puris needed to improve upon and provide actionable feedback.

123.    Jimenez responded that there was no plan, but that she would connect with Pappas to ensure that Pappas met with Ms. Puris one-on-one regularly.  These meetings were never scheduled despite Ms. Puris' repeated attempts to meet with Pappas.

124.    In or around April 2022, Ms. Puris also scheduled one-on-one meetings with colleagues to seek feedback on their peer reviews.  The only colleague to express any concern was Kim Farrell ("Farrell"), the interim Head of U.S. Marketing, who told Ms. Puris that she was encouraged by either Jimenez or Pappas to write a detailed and critical review of her.

125.    In late April 2022, Ms. Puris again complained to Jimenez about Pappas and her review.  Specifically, Ms. Puris wrote: "I am very concerned that this treatment has to do with my age and health status. Vanessa mentioned my level multiple times during the call, and I know the company is aggressively working to hire more junior talent. I have been in many groups and have

even heard Yiming during a leadership meeting that he prefers younger talent at our company. . ..
I have serious concerns both from TikTok and ByteDance based on bias due to my age as well as
documented health conditions."

126.    On April 25, 2022, Ms. Puris met with Employee Relations where she again
reported that the review Pappas provided to her was based on discriminatory animus toward Ms.
Puris' age.

127.    In particular, Ms. Puris noted that she had witnessed several executives talk about
the desire to hire younger employees and a general preference for younger employees, and that
Pappas repeatedly focused on her "level" at the Company during her review, which is effectively
discussing Ms. Puris' age.

128.    Soon after Ms. Puris made her protected complaints, Pappas began cutting Ms.
Puris out of creative sessions and other meetings relevant to her role.  Ms. Puris previously
operated as the creative leader on the TikTok Taught Me campaign, which required weekly
meetings to review scripts, storyboards, rough cuts and final assets.

129.    In April 2022, Pappas named Zuber Mohammed ("Mohammed") as the new interim
Global Head of Marketing.  However, Pappas remained Ms. Puris' supervisor based on the
Company's internal Human Resources ("HR") systems.

130.    In May or June 2022, Mohammed, who was based in Singapore, officially became
Ms. Puris' supervisor.

131.    Ms. Puris immediately began making repeated efforts to connect with Mohammed
and seek his feedback and input on projects.

132.    In particular, Ms. Puris shared her concern and confusion over Pappas' treatment
and the negative review she received.

133.    Ms. Puris diligently asked Mohammed for feedback on her performance, but he never provided it.

134.    On May 20, 2022, HR informed Ms. Puris that they investigated her complaint of age and disability discrimination and found no wrongdoing.

135.    In the first two quarters of 2022, the global consumer organization led by Pappas was also reorganizing its North American organization.  At the same time, TikTok leadership placed increasing pressure on Ms. Puris' team to meet milestones with fewer resources.

136.    For example, in the summer of 2022, Mohammed told Ms. Puris that she would no longer be allowed to replace employees who left TikTok despite high turnover.  This was extremely concerning given that Ms. Puris had shared with Mohammed, Jimenez and Pappas that her team was overworked and understaffed.

137.    In the second half of 2022, Ms. Puris provided a presentation *via* internal messaging detailing her team's staffing needs and a detailed analysis of projects and estimated hours per project, which showed that her team members would have to work almost impossible hours to complete all projects and meet all deadlines.  She also provided detailed information justifying her headcount.

138.    Throughout July and August 2022, Mohammed and Jimenez provided Ms. Puris with changing directives regarding her team.  She was told to stack rank employees, or evaluate them comparatively so that their performance ratings fit a bell curve.  Mohammed and Jimenez, at Pappas' direction, told Ms. Puris to designate which roles were highest priority and the second highest priority.

139.    Ms. Puris was then informed that all contractors, approximately five to seven individuals, needed to be fired by October 2022.

140.    Mohammed then told Ms. Puris that she needed to eliminate 20 employees from her team, or approximately 30% of her remaining employees.

141.    Ms. Puris suggested making cuts from the large team in Japan and the employees in Korea given their disproportionate headcount compared to company need.  Jimenez and Mohammed both told Ms. Puris that based on the laws in those countries, the Company could not fire anyone from Japan or Korea, but that they were trying to figure out how to skirt those laws to terminate the employees anyway.

142.    Ms. Puris asked Mohammed whether other teams at TikTok were impacted, but he refused to answer.  Instead, he told Ms. Puris that her organization was being impacted the most.

143.    Ms. Puris reached out on multiple occasions to Jimenez for guidance and clarity on how to best approach selecting employees to retain.  Jimenez suggested that Ms. Puris leverage the upcoming performance cycle and provide low ratings to a number of employees to justify their termination.

144.    During the performance cycle, Mohammed and Jimenez lowered the performance rankings of multiple individuals on Ms. Puris' team, despite their performance and peer reviews not justifying a low ranking.

145.    During 2022, Ms. Puris' team was reduced by 50 percent with most of the reduction occurring only after Ms. Puris complained to HR in April 2022.

146.    In addition, after Ms. Puris' protected complaints, TikTok began minimizing her in the Company and important decisions affecting her team were made without her input.

147.    In late July 2022, TikTok's Policy team requested that Ms. Puris' team develop a campaign directed at U.S. policymakers and Republican-led states or "Red States," featuring small and medium business owners who promoted their businesses using TikTok.

148.    After reviewing the business owners selected for the campaign, Ms. Puris expressed concerns that they were not diverse or representative of TikTok, as the campaign featured six or seven white men and only one Black woman.

149.    Ms. Puris suggested that TikTok roll out the campaign in phases to give her team time to find a more diverse group of small business owners.

150.    However, soon after, Mohammed had a conversation with Michael Beckerman ("Beckerman"), TikTok's Head of Policy, without including Ms. Puris.  Mohammed shared that Ms. Puris' team would be moving forward with the campaign because the white small business owners would be more "relevant" to the Red States being targeted.

### D.    Ms. Puris is Subjected to Sexual Harassment and the Company Fails to Take Appropriate Measures

151.    In June 2022, Ms. Puris attended Cannes Lions, a creative industry event, in France with other TikTok marketing employees.

152.    On June 21, 2022, Ms. Puris attended a dinner sponsored by Zenith Worldwide ("Zenith"), an advertising agency, with approximately 12 TikTok and Zenith employees.

153.    At the dinner, Ms. Puris met Christian Lee ("Lee"), Zenith's managing director, for the first time.  During dinner, Lee became increasingly intoxicated and moved to sit next to Ms. Puris in such a way that he blocked her from moving away from him.  Lee was slurring his speech, spilled an entire glass of wine on Ms. Puris' plate, and began repeatedly touching Ms. Puris' arm, asking her where to party after the dinner and where they could go dancing.

154.    Ms. Puris was incredibly uncomfortable with Lee's behavior toward her.  Several others at the table attempted to distract Lee to divert his attention away from Ms. Puris, but Lee was relentless.  Around 10 p.m., another TikTok employee joined the dinner and led Ms. Puris outside to get her away from Lee.

24

155.     When Ms. Puris got outside with the employee who assisted her in leaving, the employee said that she "pulled [Ms. Puris] out of the restaurant" because she recognized how uncomfortable the interaction with Lee had made Ms. Puris.

156.     Rather than going out with her team, Ms. Puris immediately returned to her hotel because she was so shaken about her interaction with Lee.

157.     The following day, on June 22, 2022, Ms. Puris reported Lee's inappropriate behavior to Mohammed.  He did not respond other than to say that Ms. Puris' concerns could be raised to Jimenez.

158.     Later that same day, Ms. Puris met with Mohammed and Jana Ulaite, Head of Marketing for TikTok Europe.  Mohammed tried to reassure Ms. Puris that the incident would be addressed.

159.     In addition, Jimenez sent Ms. Puris an internal message to acknowledge the information shared with Mohammed and requested a time to meet *via* a video call.

160.     However, a few hours prior to the scheduled video call, Jimenez canceled and shared that the Ethics team would be taking over the investigation.

161.     Ms. Puris expressed concern that TikTok was hosting an event that evening, the SoundOn Soiree, and that Lee may be in attendance.

162.     Mohammed later assured Ms. Puris that Lee would not be in attendance.

163.     On June 23, 2022, Ms. Puris led a panel in TikTok's space at Cannes Lions.  After the panel, Mohammed asked Ms. Puris if she would be joining the Zenith session that afternoon, which was also being held in a TikTok space.  Ms. Puris said she planned to attend.  Mohammed then told Ms. Puris that Lee would likely be there as well.

164.    Ms. Puris was very concerned and surprised that Lee was invited to the event, given that it was being hosted by TikTok.  As a result, Ms. Puris was forced to miss the event.  Instead, she returned to her hotel.

165.    Ms. Puris returned to New York on June 24, 2022 without ever hearing from TikTok's Ethics team.

166.    On June 27, 2022, Ms. Puris reached out to Jimenez about the lack of follow up and described in detail the events that transpired during Cannes Lions.  Ms. Puris wrote that she was "disappointed that the ethics team has not taken my concerns seriously" and that she wanted to know that "TikTok takes real action when one of their employees experiences sexual harassment."

167.    On or around June 28, Ms. Puris finally heard from TikTok's Ethics team.

168.    Lacey Rainwater ("Rainwater"), an investigator and attorney, reached out to Ms. Puris *via* internal messaging and requested a meeting.  Ms. Puris met with Rainwater over a video call, shared all of the details about Lee's sexual harassment, and answered all of Rainwater's questions.  Ms. Puris also provided Rainwater with witnesses who could corroborate her account.

169.    At Rainwater's request, Ms. Puris then sent Rainwater a screenshot of a text message she sent to a colleague that said, in sum and substance, that she was leaving the dinner because she was seated next to someone who was too drunk.

170.    Ms. Puris did not hear back from the Ethics team again until July 8, 2022, when Rainwater told her *via* internal messaging that TikTok has asked its contact at Zenith to ensure that Lee did not participate in future TikTok meetings or business.  Ms. Puris was not informed until July 29, 2022 that Lee was actually being removed from supporting the TikTok account.

**E.** **Ms. Puris Makes Another Protected Complaint and is Subjected to a Retaliatory and Unlawful Termination**

171.    On September 23, 2022, Ms. Puris emailed Jimenez and expressed concerns about the treatment of women at TikTok, age discrimination, the sexual harassment at Cannes Lion and the overall work environment.  Specifically, Ms. Puris expressed concerns that very few women had been named to permanent leadership roles during the North America reorganization; the way TikTok handled the sexual harassment incident at Cannes Lion; and the emphasis at TikTok on hiring "young, fresh talent."

172.    Just days later, Ms. Puris was fired for "performance reasons."  Pappas delivered the news of Ms. Puris' firing, which was unusual because she was no longer Ms. Puris' manager and the performance cycle had not been completed.  TikTok never addressed Ms. Puris' previous protected activity.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Title VII)
### *Against Defendants TikTok and ByteDance*

173.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

174.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her sex and age in violation of Title VII.

175.    Defendants' conduct created, condoned, ratified and acquiesced to a hostile work environment on account of Plaintiff's sex.

176.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

177.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

178.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under Title VII.

### SECOND CAUSE OF ACTION
**(Retaliation in Violation of Title VII)**
***Against Defendants TikTok and ByteDance***

179.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

180.    By the actions described above, among others, Defendants retaliated against Plaintiff for engaging in protected activity under Title VII.

181.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

182.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

183.    Defendants' unlawful and retaliatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under Title VII.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of NYSHRL)**
*Against Defendants TikTok and ByteDance*

184.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

185.   By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her sex, disability and age in violation of NYSHRL.

186.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

187.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYSHRL, Plaintiff has suffered and continues to suffer, injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

188.   Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under NYSHRL.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of NYSHRL)**
*Against Defendants TikTok and ByteDance*

189.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

190.   By the actions described above, among others, Defendants retaliated against Plaintiff for engaging in protected activity in violation of NYSHRL.

191.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

192.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

193.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under NYSHRL.

**FIFTH CAUSE OF ACTION**
**(Discrimination in Violation of NYCHRL)**
***Against Defendants TikTok and ByteDance***

194.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

195.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her sex, disability and age in violation of NYCHRL.

196.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

197.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer injury, pain,

ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

198.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under NYCHRL.

### SIXTH CAUSE OF ACTION
#### (Retaliation in Violation of NYCHRL)
##### *Against Defendants TikTok and ByteDance*

199.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

200.    By the actions described above, among others, Defendants retaliated against Plaintiff for engaging in protected activity in violation of NYCHRL.

201.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

202.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

203.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under NYCHRL.

## SEVENTH CAUSE OF ACTION
### (Interference with Protected Rights in Violation of NYCHRL)
### *Against Defendants TikTok and ByteDance*

204.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

205.    By the actions described above, among others, Defendants interfered with Plaintiff's rights as protected by the NYCHRL and in violation thereof.

206.    As a direct and proximate result of Defendants' unlawful conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

207.    As a direct and proximate result of Defendants' unlawful conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

208.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under NYCHRL.

## EIGHTH CAUSE OF ACTION
### (Age Discrimination in Violation of the ADEA)
### *Against Defendants TikTok and ByteDance*

209.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

210.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her age in violation of the ADEA.

211.    Defendants' conduct showed willful and/or wanton negligence, recklessness and conscious disregard for Plaintiff's statutorily protected rights for which Plaintiff is entitled to an award of liquidated damages.

212.    Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damages unless and until this Court grants relief.

### NINTH CAUSE OF ACTION
**(Interference in Violation of the FMLA)**
***Against Defendants TikTok and ByteDance***

213.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

214.    By the actions described above, among others, Defendants unlawfully interfered with Plaintiff's FMLA rights.

215.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

216.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer severe mental anguish and emotional distress, including but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

217.    Defendants' unlawful actions constitute reckless, intentional, malicious, willful and wanton violations of the FMLA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, through the following relief:

A.      A declaratory judgment that the actions of Defendants complained of herein violate the laws of the United States and the State of New York and City of New York;

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to emotional pain and suffering and emotional distress;

E.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

F.      An award of punitive damages, if applicable, in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 8, 2024
      New York, New York            Respectfully submitted,


**WIGDOR LLP**


By: _____
      Marjorie J. Mesidor
      Michael J. Willemin
      Monica Hincken

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
mhincken@wigdorlaw.com

*Counsel for Plaintiff*