UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                         :
KATIE ELLEN PURIS,                       :
                        Plaintiff,       :
                                         :    24cv944 (DLC)
          –v–                            :
                                         :    OPINION AND
                                         :        ORDER
TIKTOK INC., et al.,                     :
                        Defendants.      :
                                         :
                                         :
--------------------------------------- X

APPEARANCES:

For plaintiff Katie Ellen Puris:
Michael John Willemin
Monica Hincken
Wigdor LLP
85 Fifth Avenue, 5th floor
New York, NY 10003

For defendants TikTok Inc., ByteDance Ltd., and ByteDance Inc.:
Ivan D. Smith
Maureen Maria Stampp
Amanda Marie Williams
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018

DENISE COTE, District Judge:

    Plaintiff Katie Ellen Puris sued her former employer TikTok

Inc. ("TikTok"), ByteDance Ltd. ("BDL"), and ByteDance Inc.

("BDI") (collectively, "ByteDance" or "defendants") for

employment discrimination, unlawful retaliation, and

interference with employment-related legal rights.  The

defendants have moved to compel arbitration and stay the action.

They also have moved to dismiss the claims pursuant to Rule

12(b)(6), Fed. R. Civ. P.  For the following reasons, the motion
to compel arbitration is denied, and the motion to dismiss is
granted in part.

## Background

The following facts are taken from the second amended
complaint ("SAC").  Only the facts necessary to decide this
motion are included.  They are assumed to be true for the
purposes of this motion.

Puris began working at ByteDance[1] in December 2019 as a
Managing Director, Head of Business Marketing.  She was assigned
to launch the marketing organization for the company's TikTok
brand in North America.  Puris quickly received positive
feedback for her performance, including a March 2020 review that
incorporated favorable comments from supervisors and colleagues.
Around the same time, Puris was asked to lead TikTok's Global
Business Marketing team.  She accepted the offer, and in her new
role managed a team that grew to more than 100 people based in
Beijing, New York, and Los Angeles.  In that role, Puris
developed the company's marketing strategy and frequently served
as a public spokesperson.  She reported to Blake Chandlee,

---

[1] The plaintiff alleges that TikTok and BDI are subsidiaries of
BDL, that she was effectively employed by all three entities,
and that, for practical purposes, they are the same company.

ByteDance's President of Global Business Solutions, and Corinna Chen, the Head of Global Marketing Solutions. Chandlee and Chen, in turn, reported to Lidong Zhang ("Zhang"), the Chairman of ByteDance's China region. In a mid-2020 performance review, having worked in her new role for several months, Puris again received positive feedback.

In early 2020, Puris was required to propose hiring plans for the Global Business Marketing team to ByteDance's senior leadership. These plans had to be approved by Chandlee and Chen, and then by Zhang. Through Chandlee, Zhang directed that the company's preference was to hire people "with potential versus senior level people with deep experience." This comment was echoed by other comments from the company's leaders, including during a 2021 ByteDance leadership meeting, where co-founder Yiming Zhang said he would rather hire young people without experience than people with more experience. Puris was 48 years old at the time.

A.   Negative Interactions with Management in 2020 and 2021

Despite a hiring slowdown at ByteDance at the end of 2020, Puris requested an increased budget and headcount for 2021, which was initially approved in December. Shortly thereafter, however, Puris learned that Zhang decided to revoke the approval. The company's senior leadership then began

3

micromanaging Puris's team, leading to her repeatedly revising her plans for 2021 and a significant reduction in her planned headcount.

Around January 2021, Puris learned from colleagues that Human Resources Business Partner Carl Rivers had been soliciting negative feedback about her from the team that she led. Then, in a February 4 meeting, Chandlee told Puris that she would often go from "being this ball of energy like the sun" to being "like a dark star . . . the energy just gets sucked out of the room." He also told her that she wanted people to treat her "warm and fuzzy." In a March 10 meeting, Chandlee told Puris she was an "emotional superstar," "passionate," and an "amazing wife [and] mother."

Around this time, Puris had a particularly negative interaction with ByteDance's senior leadership. During a February 2021 meeting, she gave a short presentation with updates from her team. Zhang reacted negatively to Puris's celebration of her team's accomplishments, as well as to her asking permission to control the document being reviewed during her presentation. Zhang did not react in the same way to presentations by male members of senior leadership. Puris later learned that Zhang criticized her for lacking humility, which she did not hear of him doing with respect to male executives.

Chandlee told her that Zhang resented her celebrating her team's work as if to say "Look how great we are." After the presentation, she was not allowed to speak with or present to Zhang again, even after asking to meet with him to apologize and even while male executives had one-on-one meetings with him.

Puris received her 2020 performance review in March or April of 2021. Although the review included positive written reviews from colleagues, she received an "M" letter rating, which means "meets expectations." Chandlee told Puris that he had to beg Zhang to give her that rating.

B.   Reorganization and Health Issues

Around the middle of 2021, new leadership took over TikTok, although Puris's chain of supervisors remained the same. The new leadership promoted a "996" culture, which referred to the requirement that employees work from 9 a.m. to 9 p.m., six days per week. Employees were expected to ignore family and other outside obligations. As a result of these expectations and her belief that the company's leadership was trying to force her out, Puris's health deteriorated. Over seven months in 2021, Puris visited the doctor 26 times, and underwent multiple surgeries and other treatment. In March 2021, Puris first informed Chandlee, Chen, and Human Resources of her health problems and that she did not feel like she could take time off.

Kate Barney, TikTok Inc.'s Head of Human Resources for North America, told Puris that she could take time off.  But Puris did not feel that she could, in part because on one occasion after taking a few days off for doctors' visits, Chen unexpectedly assigned her a task with a short timeline, justified by her being "on vacation."

In May 2021, Chandlee and Barney told Puris that they wanted to move her to a different role, because the company wanted someone with more operational experience to do Puris's job.  Chandlee said that ByteDance's senior leadership had lost confidence in Puris in part because her leadership style was "a little bit emotional."  He told Puris there was "always gonna be kind of this undue pressure on you as an individual and as a leader."  A short time later, Chandlee told Puris that her view on the situation was "rather emotional" and that he could not "deal with emotional Katie."

Around June 2021, after Chen had been moved out of the company's Business Marketing division, Puris took a new role as Head of Global Brand and Creative Organization at TikTok.  She reported to Nick Tran, TikTok's Global Head of Marketing.  In this role, Puris led a team that created acclaimed marketing campaigns and received positive feedback from Tran in an October 2021 performance review.  Tran was fired around December 2021,

after which point Puris reported to Vannessa Pappas, TikTok's Chief Operating Officer.

ByteDance presented data at an October 2021 global leadership meeting showing that men were significantly overrepresented at the upper levels of the company's leadership. Its organizational chart reflected that only 20 percent of the executive leadership team were women.

In February or March of 2022, Puris wrote to Wendy Jimenez, Head of Global Human Resources, to express her concerns about the ByteDance workplace:

> In terms of departures, most individuals have cited extreme working conditions. At least five members on the team have taken or are currently on medical leave this year due to the severe stress and pressure of the work, which have resulted in mental and physical health conditions. I consistently flagged this to HR and management but no actions were taken to provide my team with more support. My health has been significantly impacted as well, which I repeatedly shared with HR and leadership while I was the leader of GBM. My doctor encouraged me to take a <u>medical leave</u>, which I looked into with the HR team but ultimately did not feel supported.

(Emphasis added). Puris said she did not feel supported in taking leave partially because she had been told that doing so would "impact her compensation."

In a March 14, 2022 meeting, Puris received negative feedback from Pappas, who told her she would receive an "I" rating in her 2021 full-year performance review. An "I" rating

meant "improvement needed" and was rare. The next month, Puris received a negative written review from Pappas. And in a meeting around this time, Pappas referenced Puris's "level" at the company, which Puris took to be a derogatory reference to her age. Also in April 2022, Puris heard from a colleague, Kim Farrell, that Farrell had been encouraged to write a critical review of Puris.

    C.  April 2022 Complaints and Aftermath

    In late April 2022, Puris again wrote to Jimenez. She expressed concerns that her treatment was due to her age and health conditions.

> I am very concerned that this treatment has to do with my age and health status. Vanessa [Pappas] mentioned my level multiple times during the call, and I know the company is aggressively working to hire more junior talent. I have been in many groups and have even heard Yiming [Zhang] during a leadership meeting that he prefers younger talent at our company. . . . I have serious concerns both from TikTok and ByteDance based on bias due to my age as well as documented health conditions.

(Emphasis added).

    On April 25, Puris met with Employee Relations. In that meeting, Puris said that her negative 2021 performance review was based on her age. She explained that this impression arose from her hearing executives express a desire to hire younger employees and from Pappas's repeatedly referring to her "level" in discussing her performance. On May 20, Employee Relations

8

told Puris that they investigated her complaints of age and disability discrimination but found no wrongdoing.

After making her April 2022 complaints, Pappas excluded Puris from various meetings that were relevant to her role, and the company made important decisions affecting her team without her input. Overall in 2022, the size of Puris's team was reduced by half, largely after she made her April 2022 complaints.

D.   The June 2022 Cannes Incident

In June 2022, Puris attended a creative industry event in Cannes, France, along with more than 100 other ByteDance employees. On June 21, she went to a dinner sponsored by Zenith Worldwide ("Zenith"), an advertising agency and major vendor to TikTok. The dinner was attended by various TikTok and Zenith executives, including Christian Lee, Zenith's Managing Director. Lee, who Puris had not met before, became visibly intoxicated during the dinner. He forced Puris to sit next to him by physically blocking her path to her initial place at the dinner table. He then touched her arm repeatedly, asked her where to party after the dinner, and asked her where they could go dancing. Puris was eventually able to leave when another TikTok employee intervened to remove her from the restaurant.

The next day, June 22, Puris reported the incident to her supervisor at the time, the interim Global Head of Marketing, who told her she could report it to Jimenez. Later that day, Puris met with her supervisor and Jana Ulaite, Head of Marketing for TikTok Europe. At that meeting, the supervisor told Puris that the incident with Lee would be addressed. Around the same time, Jimenez requested a time to meet with Puris regarding the incident via video call. After scheduling the call, however, Jimenez canceled it and said the company's Ethics team would be handling the situation.

On June 23, Puris's supervisor asked her if she would be attending a presentation by Zenith to TikTok that afternoon, and Puris said she would. To her surprise, however, Puris was told that Lee would likely attend as well. As a result, Puris did not attend the presentation.

On June 27, having returned from France without hearing from the Ethics team, Puris contacted Jimenez to note the lack of follow-up. She told Jimenez she was "disappointed that the ethics team has not taken my concerns seriously" and that she wanted to see that "TikTok takes real action when one of their employees experiences sexual harassment."

The next day, June 28, Lacey Rainwater, an investigator and attorney on TikTok's Ethics team, contacted Puris and requested

a meeting.  When they met, Puris told Rainwater about Lee's
conduct, answered her questions, identified witnesses to the
incident, and shared a text message that she had sent a
colleague while at the dinner with Lee.  She also told Rainwater
that, while in France, she was worried she would encounter Lee,
due to the fact that TikTok failed to ensure he was not present
for events she was attending.  She explained:

> This is sexual harassment that happened to . . . an
> executive at our company and nothing was done.  And I
> think that is totally wrong, and I'm really
> upset . . . .  [W]e've gotta make sure that that
> doesn't happen to anybody again, because it should
> have been resolved when I was on the ground.  [Lee]
> should have been excused from any kind of TikTok
> experiences like he was in our space and I couldn't
> even be there.

On July 8, Puris heard from Rainwater that TikTok had asked
Zenith to exclude Lee from future meetings and business with the
company, and she heard on July 29 that Lee was being removed
from the TikTok account.

E.  Puris's September 2022 Complaint and Firing

On September 23, 2022, Puris emailed Jimenez to express
concerns about the treatment of women at TikTok, age
discrimination, the Cannes incident, and the work environment at
the company.  She specifically noted that few women had been
placed in permanent leadership roles at TikTok North America,
that ByteDance had mishandled the Cannes incident, and that

ByteDance leadership had emphasized "young, fresh talent." Within several days,[2] Pappas told Puris that she was fired for "performance reasons."

    F.    Lawsuit

Puris filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on May 23, 2023.  The EEOC issued a Notice of Right to Sue to Puris on December 27, 2023.

On February 8, 2024, Puris filed this action, naming TikTok and BDL as defendants.  On May 6, Puris filed an amended complaint, naming BDI, Douyin Limited ("Douyin"), and Zhang as additional defendants.  On August 22, Puris filed the SAC.  On November 13, a motion to quash service brought by Douyin and Zhang was granted.  Puris v. TikTok Inc., No. 24cv944, 2024 WL 4791586 (S.D.N.Y. Nov. 13, 2024), amended, 2024 WL 5056430 (S.D.N.Y. Dec. 10, 2024).

Defendants BDI, BDL, and TikTok filed a renewed motion to compel arbitration and stay the case on September 23.  They filed a partial motion to dismiss Puris's claims pursuant to Rule 12(b)(6), Fed. R. Civ. P., on September 30.  Both motions were fully briefed on November 15.

---

[2] The SAC does not include the exact date, but it refers to Puris's firing as occurring in September 2022.

12

## Discussion

I. Motion to Compel Arbitration

Puris does not dispute that she agreed to arbitrate disputes with the defendants, but she argues that the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), 9 U.S.C. 402, allows her to avoid mandatory arbitration in this case. She is correct, and the defendants' motion to compel arbitration is denied.

Under the Federal Arbitration Act ("FAA"), agreements to arbitrate disputes generally must be enforced according to their terms. Olivieri v. Stifel, Nicolaus & Co., 112 F.4th 74, 84 (2d Cir. 2024). But the EFAA, enacted in 2022, amended the FAA to allow plaintiffs alleging conduct related to sexual harassment or sexual assault to avoid otherwise enforceable arbitration agreements. Id. Under the EFAA:

> [A]t the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, . . . no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute.

9 U.S.C. § 402(a) (emphasis added). The EFAA applies to any "dispute or claim that arises on or after the date" of EFAA's enactment, which was March 3, 2022. Olivieri, 112 F.4th at 84 (citing 9 U.S.C. § 401 note). The applicability of the EFAA is

13

to be determined under federal law and by a court rather than by an arbitrator.  9 U.S.C. § 402(b).

The EFAA defines "Sexual harassment dispute" as "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law."  Id. § 401(4).  The Court of Appeals for the Second Circuit has interpreted the EFAA's definition of "sexual harassment dispute" as extending to "retaliation from a report of sexual harassment."  Olivieri, 112 F.4th at 92.

Here, Puris has alleged that defendants retaliated against her for her June 2022 report of sexual harassment by Zenith's Lee, and that their doing so violated federal, state, and local law.  Among other allegations, Puris says that she was fired in September of 2022 at least in part for complaining about the sexual harassment she experienced in Cannes and the defendants' response to it.  Accordingly, this dispute is one "relating to conduct that is alleged to constitute sexual harassment" under applicable law.

The defendants argue that the EFAA does not apply because Puris has not plausibly pled a retaliation claim under the standards applicable to motions to dismiss for failure to state

a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P.[3]  For the
reasons discussed in the section of this Opinion addressing the
defendants' motion to dismiss, she has.

The defendants also argue that even if the EFAA applies to
some of Puris's claims, the rest still must be arbitrated and
should be severed accordingly.  They are incorrect.  The EFAA
states that an arbitration agreement is unenforceable with
respect to "a case" which relates to the sexual harassment
dispute.  9 U.S.C. § 402.  It does not say that such an
agreement is unenforceable with respect to a "claim" of sexual
harassment.  "[C]onstruing each word in its context and in light
of the terms surrounding it," United States v. Bedi, 15 F.4th
222, 226 (2d Cir. 2021) (citation omitted), the EFAA excludes
the entire case -- not only certain claims -- from mandatory
arbitration, so long as it "relates to" the sexual harassment
claim, as this case does.  Various well-reasoned decisions in
this district have reached the same conclusion.  E.g., Johnson
v. Everyrealm, Inc., 657 F. Supp. 3d 535, 558 (S.D.N.Y. 2023);
see also Baldwin v. TMPL Lexington LLC, No. 23cv9899, 2024 WL
3862150, at *7 (S.D.N.Y. Aug. 19, 2024) (observing that the

---

[3] The parties disagree about whether the EFAA's applicability
hinges on the relevant claims' meeting the "plausibility"
standard used for Rule 12(b)(6) motions or their reaching some
lower bar.  But because Puris's retaliation claims survive the
defendants' motion to dismiss, this issue need not be resolved.

holding of Johnson v. Everyrealm, Inc. "has been widely followed
by courts in this District" (citation omitted)).  The
defendants' application to sever the claims not involving
allegations of sexual harassment is denied.

   II.    Motion to Dismiss

      To survive a motion to dismiss under Fed. R. Civ. P.
12(b)(6), a party "must plead enough facts to state a claim to
relief that is plausible on its face." Green v. Dep't of Educ.,
16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp.
v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial
plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Vengalattore
v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting
Ashcroft v. Iqbal, 566 U.S. 662, 678 (2009)).  "In determining
if a claim is sufficiently plausible to withstand dismissal," a
court "accept[s] all factual allegations as true" and "draw[s]
all reasonable inferences in favor of the plaintiffs." Melendez
v. City of N.Y., 16 F.4th 992, 1010 (2d Cir. 2021) (citation
omitted).

      The SAC first alleges that the defendants discriminated
against Puris on the basis of gender, and created a hostile work
environment, in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").  Second, she
claims she was retaliated against for engaging in protected
activity under Title VII, the New York State Human Rights Law,
N.Y. Exec. Law § 290 et seq. ("NYSHRL"), and New York City Human
Rights Law, N.Y.C. Admin. Code §8-101 et seq. ("NYCHRL").
Third, she alleges that the defendants discriminated against her
on the basis of sex, disability, and age in violation of the
NYSHRL and the NYCHRL.  Fourth, Puris alleges the defendants
interfered with her rights protected by the NYCHRL.  Fifth, she
says that the defendants discriminated against her on the basis
of her age in violation of the Age Discrimination in Employment
Act, 29 U.S.C. § 621 et seq. ("ADEA").  Finally, Puris claims
that the defendants unlawfully interfered with her rights under
the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.
("FMLA").

     For the following reasons, the defendants' motion is
granted in part.  The core of the plaintiff's complaint is the
allegation that her employment was terminated in September of
2022 in retaliation for her complaints of age and sex
discrimination.  She sufficiently states a retaliation claim
under federal, state, and city law.  Puris's claim for unlawful
sex-based disparate treatment under Title VII is dismissed.  She
sufficiently states a gender-based hostile work environment

claim under Title VII, the NYCHRL, and the NYSHRL, an age-based discrimination claim under federal, state, and local law, and a claim for interference with her FMLA rights.  Puris's disability discrimination and NYCHRL interference claims are dismissed.

A.    Retaliation

The SAC brings three claims for retaliation.  It asserts that the defendants retaliated against her in violation of Title VII, the NYSHRL, and the NYCHRL.  The defendants have moved to dismiss each of these claims.  That motion is largely denied.

1.    Title VII Retaliation Claim

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The plaintiff's Title VII claims assert discrimination and retaliation because of her sex.

Title VII "prohibits an employer from discriminating against an employee because the employee has engaged in protected activity."  Banks v. Gen. Motors, LLC, 81 F.4th 242, 275 (2d Cir. 2023).  To establish a claim for retaliation, a plaintiff must allege that

> (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there

18

was a causal connection between the protected activity and that adverse action.

Qorrolli v. Metro. Dental Assocs., D.D.S., 124 F.4th 115, 122 (2d Cir. 2024) (citation omitted).  "Protected activity includes opposing an unlawful employment practice . . . ."  Banks, 81 F.4th at 275 (citing Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006)).  "[W]hen an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity."  Littlejohn v. City of N.Y., 795 F.3d 297, 312-13 (2d Cir. 2015) (quoting Crawford v. Metro. Gov't, 555 U.S. 271, 276 (2009)).  Still, the communication must be "reasonably understood as describing conduct prohibited by Title VII."  Qorrolli, 124 F.4th at 123.  And a "materially adverse action" is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Carr v. N.Y.C. Transit Auth., 76 F.4th 172, 179 (2d Cir. 2023) (citation omitted).

To show a causal connection, "the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action.  'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."

Duplan v. City of N.Y., 888 F.3d 612, 625 (2d Cir. 2018)
(citation omitted).  Also, "[a] retaliatory purpose can be shown
indirectly by timing: protected activity followed closely in
time by adverse employment action."  Vega v. Hempstead Union
Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015).

The plaintiff appears to contend that she engaged in
activity protected by Title VII when she complained in June 2022
about her company's response to the sexual harassment she
experienced in Cannes and when she sent her September 2022 email
to Jimenez referencing sex-based discrimination.[4]  Puris has
stated a claim that her firing amounted to unlawful retaliation
for complaints she made in June and September of 2022 regarding
her employer's response to sexual harassment and its treatment
of women.[5]  Both of the June 2022 and September 2022 complaints
expressed opposition to her employer's discrimination on the
basis of sex.  Puris has sufficiently alleged a causal
connection between her protected activity and her firing; the

---

[4] The SAC does not identify the protected activity on which the
plaintiff relies to support a Title VII retaliation claim.
Similarly, the parties' briefing on the retaliation claims do
not identify which argument corresponds to the Title VII claim.

[5] Puris's brief posits that a series of actions besides her
firing, largely related to the staffing of the team she
supervised, also amounted to unlawful retaliation.  But those
actions began well before Puris's protected activity in June and
September 2022.

temporal relationship alone is sufficient to state a Title VII retaliation claim.  See Banks, 81 F.4th at 277 ("[A] period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action.").

The defendants argue in essence that they responded appropriately to Puris's complaints and fired her for legitimate performance reasons.  This description of the defenses that may be offered does not provide a basis to dismiss Puris's claim.

2.    State and City Law Retaliation Claims

Puris alleges unlawful retaliation due to complaints about sex, age, and disability discrimination under state and city law.[6]  The defendants move to dismiss these claims as well.  For the reasons stated below, Puris's sex- and age-based retaliation claims survive, but her disability-based retaliation claim is dismissed.

Under the NYCHRL and NYSHRL, a "similar but slightly broader standard" than found in federal law applies to retaliation claims.  Qorrolli, 124 F.4th at 122.  "[A] plaintiff claiming retaliation must demonstrate that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to

---

[6] Claims for age and disability retaliation are not governed by Title VII.

deter a person from engaging in such action." Id. (citation
omitted). And unlike Title VII, the NYCHRL and NYSHRL protect
complaints about discrimination on the basis of age and
disability, as well as sex. N.Y.C. Admin. Code § 8-107(1)(a);
N.Y. Exec. Law § 296(1)(a).

Puris has stated a claim under state and city law due to
complaints about sex discrimination for the same reasons she has
under Title VII. Puris has also stated an age-based retaliation
claim. Her late April 2022 and September 23, 2022 emails to
Jimenez qualify as protected activity under the NYCHRL, as they
complained of discrimination on the basis of age.[7] The
defendants repeat their argument that their reasons for firing
Puris were legitimate and nondiscriminatory. Again, that
contention raises factual questions and cannot support dismissal
at this stage.

Puris has not, however, stated a claim of retaliation for
complaining about disability discrimination. Her February or
March 2022 email complained that working conditions had caused
health issues and that she felt unsupported in taking leave, but

---

[7] This conclusion applies to Puris's complaints referencing
unlawful discrimination, but it does not apply to Puris's first
email of February or March 2022 to Jimenez that complained about
poor working conditions, a lack of resources, and not feeling
supported in taking leave. See Qorrolli, 124 F.4th at 123-24.

neither of those contentions referenced discrimination on the basis of disability.[8]  Her April 2022 email referred primarily to age discrimination; the additional, vague reference to her "health status" does not turn the email into a complaint about disability discrimination as well.  And her June 2022 and September 23, 2022 complaints about other forms of discrimination also made no reference to disability discrimination.

B.    Federal Sex Discrimination Claims

Puris argues that the defendants violated Title VII both by intentionally discriminating against her on the basis of sex and by creating a hostile work environment.  The defendants' motion to dismiss is granted with respect to Puris's claim of disparate treatment, but not with respect to her hostile work environment claim.

1.    Disparate Treatment

Under Title VII, intentional discrimination is known as "disparate treatment" discrimination.  Bart v. Golub Corp., 96 F.4th 566, 569 (2d Cir. 2024).  To succeed on such a claim, a plaintiff must prove discrimination "either by direct evidence

---

[8] Both the NYSHRL and NYCHRL define "disability" more narrowly than one's general "health status."  N.Y.C. Admin. Code § 8-102; N.Y. Exec. L. § 292(21).

of intent to discriminate or, more commonly, by indirectly
showing circumstances giving rise to an inference of
discrimination." Id. (citation omitted). On a motion to
dismiss, "what must be plausibly supported by facts alleged in
the complaint is that the plaintiff (1) is a member of a
protected class, (2) was qualified, (3) suffered an adverse
employment action, and (4) has at least minimal support for the
proposition that the employer was motivated by discriminatory
intent." Buon v. Spindler, 65 F.4th 64, 79 (2d Cir. 2023)
(citation omitted). An "adverse employment action" entails a
"materially adverse change in the terms and conditions of
employment," and not merely, for example, "an alteration of job
responsibilities." Id. (citation omitted). As to the question
whether the action was motivated by discriminatory intent, an
action is because of a plaintiff's protected characteristic
"where it was a substantial or motivating factor contributing to
the employer's decision to take the action." Vega, 801 F.3d at
85 (citation omitted).

A plaintiff may make this showing by "alleging facts . . .
that indirectly show discrimination by giving rise to a
plausible inference of discrimination." Id. at 87. Such an
inference can arise from various kinds of evidence, including
criticism by the employer in "degrading terms" that reference

the protected characteristic, "invidious comments about others in the employee's protected group," "the more favorable treatment of employees not in the protected group," "the sequence of events leading to the plaintiff's discharge," and "an employer replac[ing] a terminated or demoted employee with an individual outside the employee's protected class." Littlejohn, 795 F.3d at 312-13 (citation omitted).

Puris has alleged only one discrete adverse employment action that could form the basis of an intentional discrimination claim, which is her September 2022 firing.  Other instances of mistreatment, including increased scrutiny on Puris's performance, not being allowed to present, and negative performance reviews and other criticism do not amount to a "materially adverse change in the terms and conditions of employment."  Buon, 65 F.4th at 79.

With respect to her firing, Puris has not adequately alleged actionable discrimination.  According to the SAC, she was qualified for her role and was nevertheless fired.  But it does not allege facts that plausibly support the notion that her firing was motivated by discriminatory intent.

Puris argues that she has pleaded facts that show the defendants were biased against women, such as criticism of her February 2021 presentation and her being called "emotional" and

similar terms in May 2021.  But these few comments exhibit no apparent link, direct or indirect, to Puris's firing over a year later.  See Tolbert v. Smith, 790 F.3d 427, 437 (2d Cir. 2015) ("The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." (citation omitted)).  Puris next points to various factual allegations that she says support an inference of discriminatory intent, especially ByteDance's lack of gender diversity and the complaints of other employees or former employees.[9]  Again, these facts are untethered from the adverse action that forms the basis of her claim.  They may be consistent with a discriminatory firing, but none of them provides sufficient support for the conclusion that the specific adverse action at issue was discriminatory.  See Iqbal, 556 U.S. at 678.  Because Puris has not pleaded facts showing that sex-based bias was a substantial or motivating factor in her firing, her Title VII sex-based disparate treatment claim is dismissed.

2.   Hostile Work Environment

A "hostile work environment claim involves repeated conduct," and the incidents underlying it "occur over a series

---

[9] Puris's brief emphasizes Zhang's long-running determination to remove Puris from the company, but, even assuming that allegation is true, it shows only that he intended to fire her, not that he intended to do so because of her gender.

of days or perhaps years," even when "a single act of harassment may not be actionable on its own." King v. Aramark Servs., 96 F.4th 546, 559-60 (2d Cir. 2024) (citation omitted). "Because a constellation of events over time can collectively give rise to a hostile environment claim," such a claim is timely if "an act contributing to the hostile environment occurs within the filing period." Id. at 560 (citation omitted). For the "continuing violation doctrine" to render a hostile workplace environment timely, the timely act must be "shown to be part of the course of the discriminatory conduct that underlies the hostile workplace claim." Id. at 561 (emphasis omitted).

Puris claims that she experienced a course of discriminatory conduct that included various criticism and scrutiny in 2021 and early 2022, mishandling of her sexual harassment complaint in June 2022, and her firing in September 2022. She alleges that this conduct amounted to an "hostile work environment" in violation of Title VII. The defendants' only basis for moving to dismiss this claim is that any conduct that could support it is too old to survive the applicable statute of limitations, under which conduct prior to July 27, 2022 is time-barred. Puris responds that the statute of limitations does not begin to run until the last act of the defendants that allegedly furthered the hostile work

environment, which was after July 27, 2022.  Puris is correct;
her hostile work environment claim arises from allegedly linked
conduct that occurred both before and during the limitations
period and thus is timely.  The defendants' motion to dismiss
Puris's Title VII hostile work environment claim is denied.

    C.   State and City Sex Discrimination Claims

    Based on the same set of facts as those underlying her
Title VII claims, Puris alleges that the defendants
discriminated based on her gender by firing her, and that they
maintained a hostile work environment in violation of state and
city law.  The defendants largely repeat their arguments to
dismiss her Title VII claims.  Puris's claims of discriminatory
treatment and her hostile work environment claims under state
and city law survive.

    To state a claim for gender discrimination under the NYSHRL
and NYCHRL, "the plaintiff need only show differential
treatment -- that she is treated less well -- because of a
discriminatory intent," regardless of that treatment's severity
and pervasiveness.  Mihalik v. Credit Agricole Cheuvreux N. Am.,
Inc., 715 F.3d 102, 110 (2d Cir. 2013).  The NYCHRL is construed
more liberally than its federal counterpart.  Id. at 109.  And
while the NYSHRL once aligned with Title VII, the Second Circuit
has explained in the context of retaliation claims that "it was

28

amended in 2019 to align with the NYCHRL's more liberal pleading standard." Qorrolli, 124 F.4th at 122-23.  That reasoning applies with equal force to NYSHRL disparate treatment and hostile work environment claims.

Unlike under Title VII, the plaintiff is not limited to challenging "materially adverse employment actions" or even tangible conduct, such as hiring or firing. Mihalik, 715 F.3d at 110, 114.  As a consequence, the plaintiff's claims for disparate treatment under the NYSHRL and NYCHRL are indistinguishable from her hostile work environment claims.

Puris has stated a claim for hostile work environment under state and city law.  Under the NYCHRL and NYSHRL, the plaintiff has a lower burden to allege a hostile work environment than she does under Title VII. Williams v. N.Y.C. Housing Auth., 61 F.4th 55, 69 (2d Cir. 2023).  She does not need to allege "either materially adverse employment actions or severe and pervasive conduct." Mihalik, 715 F.3d at 114.  Puris has cleared the low bar to allege that she was treated "less well" because of her gender. Id. at 110 (citation omitted).  That is, she claims the defendants engaged in a course of conduct including unfair criticism and exclusion from decisionmaking, which did not apply to male coworkers.  She has supported this claim by alleging that there were few women executives at

ByteDance, and that other employees expressed concerns to her about gender-based mistreatment.[10]

D.    Disability Discrimination

The SAC brings claims of disability discrimination under state and local law.  To allege disability discrimination under the NYCHRL and NYSHRL, as with sex-based discrimination, the plaintiff "need only show differential treatment -- that she is treated 'less well' -- because of a discriminatory intent." Mihalik, 715 F.3d at 110 (citation omitted).  The NYCHRL prohibits discrimination based on "actual or perceived . . . disability," and it defines "disability" as "any physical, medical, mental or psychological impairment, or a history or record of such impairment."  N.Y.C. Admin. Code §§ 8-107(a)(1), 8-102.  The NYSHRL defines "disability" similarly but somewhat more narrowly, requiring an impairment "resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is

---

[10] In the briefing in support of their motion to compel arbitration, the defendants argue at length that Puris cannot bring any claims under the NYCHRL and NYSHRL based on conduct that took place outside of New York, including relating to the Cannes Incident.  To the extent that argument is incorporated into their motion to dismiss, it is rejected.  Puris was a resident of New York who worked in New York, and all of her claims center on that employment.  While New York courts have limited the NYSHRL's and NYCHRL's reach in cases involving employees who are not residents of New York or who are not based here, those decisions are not applicable to Puris.

demonstrable by medically accepted clinical or laboratory

diagnostic techniques" (or a condition regarded by others as

such).  N.Y. Exec. L. § 292(21).

Puris claims that her employer unlawfully discriminated

against her on the basis of disability in the course of

criticizing her, excluding her from decisionmaking, and firing

her.  The defendants argue that Puris has not sufficiently

alleged any particular disability or that she suffered adverse

action because of one.  The defendants are correct, and this

claim is dismissed.

Puris has not stated a claim for disability discrimination,

because she has not plausibly alleged that she was treated less

well because of any disability.  The SAC contains no information

about what particular disability she suffered that would bring

it within the definitions of the NYCHRL, other than that she

experienced unspecified "health issues."  She alleges that she

experienced those issues as a result of mistreatment by the

defendants and poor working conditions, but, even assuming that

is true, it does not mean she was treated less well because of

those health issues or any related disability or the perception

that she was disabled.

She also alleges she did not "feel supported in taking a

leave because she was informed that doing so would impact her

compensation." But the fact that she was not allowed to take leave would not show she was treated less well because of any disability either.

Puris cannot merely allege the conclusion that she faced discrimination based on some unspecified disability. See Twombly, 550 U.S. at 555. Even in the context of the liberally construed NYCHRL and NYSHRL, the plaintiff must "allege enough to nudge [her] claims across the line from conceivable to plausible." Vega, 801 F.3d at 87 (quoting Twombly, 550 U.S. at 570). Puris has not done so, and her disability discrimination claims are dismissed.

    E.    Age Discrimination

The SAC alleges that Puris's firing amounted to unlawful discrimination on the basis of age, in violation of the ADEA, the NYSHRL, and the NYCHRL.[11] The defendants argue only that the plaintiff's ADEA claim is untimely to the extent it arose from conduct prior to July 27, 2022. That argument fails, as Puris's firing took place in September 2022.[12]

_____

[11] In her briefing on this motion, Puris acknowledges that the SAC's inclusion of a Title VII age discrimination claim was a drafting error.

[12] The parties' briefing addresses Puris's age discrimination claims as if they are based in part on a hostile work environment theory. But the SAC alleges a hostile work environment only with respect to sex.

32

F.    Interference with FMLA Rights

The FMLA guarantees that covered employees can take 12 workweeks off of work each year for certain purposes, including because of a "serious health condition."  29 U.S.C. § 2612(a)(1)(D).  It also requires that employers do not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA right.  Id. § 2615(a)(1).  To succeed in suing under this provision, "a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA." Graziadio v. Culinary Inst., 817 F.3d 415, 424 (2d Cir. 2016). An employer that "discourages but does not deny an employee's request for FMLA leave" violates the law.  Kemp v. Regeneron Pharms., Inc., 117 F.4th 63, 66 (2d Cir. 2024).

Puris has stated a claim that the defendants interfered with her FMLA rights by discouraging her from taking leave.  The defendants argue that she failed to assert her FMLA rights and thus cannot state a claim.  The defendants' argument misses the mark, and Puris's FMLA interference claim survives.

Puris does not allege that she ever requested FMLA leave.[13] But she does allege that, after telling her employer about her

---

[13] In her early 2022 email to Jimenez, Puris stated that "[m]y doctor encouraged me to take a medical leave, which I looked into with the HR team but ultimately did not feel supported."

health issues and that her doctor encouraged her to take medical
leave, she was "informed" that taking leave "would impact her
compensation."  If that is true, a reasonable jury could find
that the defendants "in some manner impeded the employee's
exercise of" FMLA rights.  Potenza v. City of N.Y., 365 F.3d
165, 168 (2d Cir. 2004).  Recently, in Kemp, the Second Circuit
clarified that "interference or restraint alone, which includes
discouragement, is enough to establish a[n FMLA interference]
violation."  Kemp, 117 F.4th at 69 (citation omitted).  The
Court of Appeals clarified that the requirements for a claim
enumerated in Graziadio, which included "that [the plaintiff]
gave notice to the defendant of her intention to take leave,"
817 F.3d at 424, applied particularly in a case where the
"employer had denied her eligible request for FMLA leave."
Kemp, 117 F.4th at 69 (citation omitted).  Accordingly, the
motion to dismiss this claim is denied.

     G.   Interference with NYCHRL Rights

     Finally, Puris claims the defendants "threat[ened]" her
employment by forcing her out of ByteDance, thus illegally
interfering with her NYCHRL rights.  The defendants posit that
she fails to state a claim because she alleges no injury beyond

---

The statement that Puris "looked into" taking leave does not
amount to an allegation that she requested it.

the adverse employment actions that form the basis of her discrimination and retaliation claims. The defendants are correct.

Under the NYCHRL, "[i]t shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with . . . any person in the exercise or enjoyment of" any NYCHRL right, or to attempt to do so. N.Y.C. Admin Code § 8-107(19). According to Puris's brief, the conduct the defendants took in violation of this provision was her placement on a "kill list," which meant they would drive her out of the company. But an interference claim requires something more than discrimination in the course of a person's employment; otherwise, the NYCHRL's prohibition on interference would be superfluous. Apart from her claim of employment discrimination, Puris does not explain, either in the SAC or briefing for the instant motion, what "right granted or protected pursuant" to the NYCHRL was subject to coercion, intimidation, threat, or interference. Accordingly, Puris's NYCHRL interference claim is dismissed.

## Conclusion

The defendants' September 23, 2024 motion to compel arbitration and stay the action is denied. The defendants'

September 30, 2024 motion to dismiss is granted in part.    A

scheduling order accompanies this Opinion.

Dated:      New York, New York
            January 30, 2025

                                _____
                                DENISE COTE
                                United States District Judge